## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| Harbourview Products International, LLC<br><br>　　*Plaintiff, individually and on behalf of all others similarly situated,*<br><br>　　　　v.<br><br>United Parcel Service, Inc. ("UPS"); and UPS Supply Chain Solution, together, "UPS entities"; the United States of America, and the United States Customs and Border Protection<br><br>　　*Defendants.* |

Case No. 1:26-cv-1471
Jury Trial Demanded

## CLASS ACTION COMPLAINT

Plaintiff Harbourview Products International, LLC ("HPI" or "Plaintiff"), Importer of Record, by and through its attorneys, based on personal knowledge as to itself, investigation, and upon information and belief and alleges the following:

### I.    INTRODUCTION

1.    This is a civil class action for an injunction, declaratory relief, damages, and other relief on behalf of Plaintiff and a proposed Class of individuals and entities, who purchased goods subject to illegal tariffs imposed and collected by UPS entities arising out of Defendants' collection of tariffs prohibited under federal and state law resulting in an approximately $130+ billion windfall to the United States Government.

2.    Beginning in February 2025, through a series of executive orders, the President of the United States invoked the International Emergency Economic Powers Act ("IEEPA") as authority to impose new and substantial tariffs ("IEEPA tariffs") on goods imported from nearly every foreign country,

and eliminate the *de minimus* exception[1], including countries from which Plaintiff purchased goods. Plaintiff was responsible for paying these tariffs on its purchased goods.

3.    This Court and the Federal Circuit held that IEEPA does not authorize these tariffs, thus rendering the IEEPA tariffs and the underlying executive orders unlawful. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir.), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

4.    The Supreme Court heard oral argument in *V.O.S. Selections* and a companion case arising out of the U.S. District Court for the District of Columbia[2] on November 5, 2025, and found the tariffs illegal on February 20, 2026. *Learning Resources, Inc. v. Trump*, 607 U.S. ____ (2026) (affirming the Court of International Trade ("CIT") judgment in Case No. 25-250 finding "IEEPA does not authorize the President to impose tariffs.").

5.    The Supreme Court sent a "clear signal" that the president does not have unlimited unilateral authority and that he had overstepped his authority. *Id*

6.    "The power to impose tariffs is "very clear[ly]… a branch of the taxing power." *Learning Resources* citing *Gibbons v. Ogden*, 9 Wheat 1, 201 (1824). "A tariff," after all, "is a tax levied on imported goods and services." *Id,* 607 U.S. at 6. The Framers gave Congress "alone….access to the pockets of the people." *Id.* "A customs "duty" is simply "the federal tax levied on goods shipped into the United States. *Id.* citing Black's Law Dictionary 638 *12th ed. 2024.

7.    This action is necessary because UPS illegally imposed import tariffs from April 2, 2025, and *after* both the CIT and the Federal Circuit ruled the tariffs and the underlying and subsequent executive orders were unlawful on May 28, 2025, and August 25, 2025, respectively, and the Supreme Court declared the IEEPA tariffs unlawful on February 20, 2026.

---

[1] *Axle of Dearborn, Inc. v. Department of Commerce*, 791 F. Supp.3d 1363, U.S. Ct. Intl. Trade.

[2] *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025).

8.    The UPS entities facilitate the payment of these illegal tariffs to the government.

9.    This action is also necessary because under established U.S. law, customs tariffs collected without statutory authority constitute an illegal exaction. Courts have long recognized that when tariffs are later invalidated, the government cannot lawfully retain those amounts which is underscored in *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1334 (Fed. Cir. 2025). The CIT issued an order shedding light on the path to seeking refunds. According to the CIT's ruling, if the Supreme Court strikes down the IEEPA tariffs, refunds should be obtainable through court-ordered reliquidation, including for entries that have already been liquidated. [3]

10.    This Court made two key findings: (1) the CIT has power to order reliquidation and refunds where the government has unlawfully imposed tariffs, and (2) the CIT will retain jurisdiction over claims for refunds for the two-year statute of limitations that applies to such claims under 28 U.S. 1581(i).[4]

## II.    JURISDICTION

11.    This Court has exclusive subject matter jurisdiction under 28 U.S.C. § 1581(i). *See Learning Resources Inc., v. Trump,* 607 U. S. ___ (2026) (Slip Opinion, p 5, fn1)*; V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1334 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025) and because this action is commenced against the United States Customs and Border Protection and arises out of executive orders providing for illegal tariffs. 28 U.S.C. § 1581(i)(1)(B); *see Silfab Solar, Inc. v. United States*, 296 F. Supp. 3d 1296 (Ct Int'l Trade 2018).

12.    In a civil action under 28 U.S.C. § 1581, the CIT can enter a money judgment against the United States and can order any other appropriate civil relief, including declaratory judgments, injunctions, orders of remand, and writs of mandamus or prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

13.    The Supreme Court agreed with the Federal Circuit that the *V.O.S. Selections* case that was

---

[3]  *AGS Co. Auto. Solutions, et.al., v. CBP, et al.,* Slip Op. 25-154, 2025 WL 3634261, Dec. 15, 2025 U.S. Courr of International Trade

[4]  *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1334 (Fed. Cir. 2025)

consolidated with the *Learning Resources* case falls withing the exclusive jurisdiction of the CIT because the plaintiffs' challenges "arise[ ] out of" modifications to the Harmonized Tariff Schedule of the United States "HTSUS."

14.    Further, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Plaintiff's claims arise under imposition of an illegal IEEPA tariff and state law because Plaintiff alleges a declaratory judgment and the imposition of a constructive trust.

15.    This Court independently has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because, given the number of customers served by UPS entities, the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which at least one member of the class is a citizen of a different state than Defendants.

16.    Plaintiff has standing to bring this lawsuit because it is an entity that imported goods into the United States from countries subject to the unlawful IEEPA tariffs as imposed and collected by United States Customs and Border Protection ("CBP") through UPS entities. As a result of the Supreme Court ruling, Plaintiff has paid IEEPA tariffs and related fees to the United States as a result of importing goods into the United States and thus has suffered injury cause by those orders. Declaratory and additional relief from this Court would redress those injuries.

### III.    PARTIES

17.    Plaintiff, Harborview Products International LLC, ("Harbourview or "HPI") is an Importer of Record, and is an Ohio Limited Liability Company.  It is a product sourcing and development company with more than 30 years of experience helping businesses bring custom products to market. The company manages the full product development cycle, guiding clients from initial concept and artwork through sourcing, manufacturing, importing, and final delivery. Harbourview primarily serves the restaurant, hospitality, and entertainment industries, creating customized products tailored to those sectors. HPI purchased items subject to the illegal IEEPA tariffs and was forced to pay excessive import tariffs to

UPS before the goods were delivered and is therefore an interested party pursuant to 28 U.S.C § 2631(c) and (i).

18.    On May 28, 2025, HPI paid tariffs/duties to import goods from a country subject to the illegal tariffs.

19.    Of those tariffs/duties 100% is attributable to the illegal IEEPA tariffs.

20.    Defendant United Parcel Service, Inc., maintains a principal place of business in 55 Glenlake Parkway NE, Atlanta, GA and is responsible for customs compliance, who imposed the illegal tariffs on Plaintiff and the Class and a shipper/exporter and receiver/consignee of the goods and is therefore an interested party pursuant to 28 U.S.C. § 2631(c) and (i).

21.    Defendant UPS Supply Chain Solutions maintains a principal place of business at 12380 Morris Road, Alpharetta, GA 30005 and is responsible for customs compliance, who imposed the illegal tariffs on Plaintiff and the Class and a shipper/exporter and receiver/consignee of the goods and is therefore an interested party pursuant to 28 U.S.C. § 2631(c) and (i).

22.    Defendants own and operate companies which offer international services including mail and parcel, freight transport, and supply chain management, and customs services, among others.

23.    Among its customs services, United Parcel Service, Inc. and UPS Supply Chain Solutions ("collectively, "UPS") offers customs services such as Import and Export Clearance.

24.    UPS entities collected illegal tariffs from Plaintiff and the Class for goods imported to the United States from countries for which illegal IEEPA tariffs were imposed.

25.    On February 24, 2026, UPS announced it will no longer collect IEEPA tariffs on Customs and Border Protection instructions but made no mention that day of issuing refunds.

26.    Defendant United States Customs and Border Protection ("CPB") is a component federal agency of the Department of Homeland Security, responsible for, among other things, securing ports of entry and collecting tariffs or duties and taxes on goods imported into the United States. It is headquartered

in Washington, D.C.

27.    Defendant United States of America received the illegal IEEPA tariffs and is the statutory defendant under 5 U.S.C. 702 and 28 U.S.C. 1581(i)(1)(B).

## IV.    TIMELINESS OF THE ACTION

27.    A plaintiff must commence an action under 28 U.S.C. § 1581(i)(1)(B) "within two years after the cause of action first accrues." 28 U.S.C. § 2636(i).

28.    Plaintiff commenced this action by filing a summons and complaint with the Court on March 4, 2026. As this matter has been commenced within two years of the cause of action of the United States, such action satisfies the timeliness requirement in accordance with 19 U.S.C. § 1621.

## V.    STANDING

29.    To establish standing, a plaintiff must show injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Plaintiff is harmed by the challenged tariff action because Plaintiff directly imported goods from countries subject to the illegal IEEPA tariffs and thus paid tariffs to the federal government because of the illegal IEEPA tariffs and corresponding revisions to the HTSUS. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Hein v. Freedom From Religion Found., Inc*., 551 U.S. 587, 599 (2007) ("being forced to pay" money to the government "causes a real and immediate economic injury"). Declaratory and injunctive relief will redress these injuries because Plaintiff will no longer be required to pay the tariff or make harmful changes to their business operations to account for increased costs.

## VI.    FACTS

30.    On February 1, 2025, the President issued Executive Order 14195, entitled "Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China" (the "China

6

Executive Order").[5]

31.     The China Executive Order declared that a national emergency posed by the influx of illegal aliens and drugs into the United States applied to the Chinese government's failure to "arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs." It declared that China's failure to act constituted "an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States."

32.     The China Executive Order imposed an incremental 10% tariff in addition to existing tariffs on all imports from China.

33.     On March 3, 2025, the President issued Executive Order 14228, entitled "Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China,"[6] which doubled the incremental tariffs on imports from China to 20%. As justification for the rate increase, it stated that the Chinese government had "not taken adequate steps to alleviate the illicit drug crisis."

34.     On April 2, 2025, so called "Liberation Day," the President issued Executive Order 14257, entitled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits" (the "Liberation Day Order").[7]

35.     The "Liberation Day" Order imposed sweeping new tariffs at rates not seen since the Great Depression—including a global 10% tariffs on nearly all countries in the world, regardless of whether they impose tariffs on United States products, the rates at which they do so, or the existence of any trade agreements governing the relationship. These tariffs even applied to places with no civilian population or

---

[5] Available at https://www.whitehouse.gov/presidential-actions/2025/02/imposing- duties-to- address-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china/.

[6] Available at https://www.whitehouse.gov/presidential-actions/2025/04/further- amendment-to- duties-addressing-the-synthetic-opioid-supply-chain-in-the-peoples- republic-of-china-as- applied-to-low-value-imports/.

[7] Available at https://www.whitehouse.gov/presidential-actions/2025/04/regulating- imports- with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large- and-persistent-annual- united-states-goods-trade-deficits/.

international trade activity, such as the British Indian Ocean Territory, whose only human inhabitants belong to a joint American and British military base on the island of Diego Garcia, and the Heard and McDonald Islands, which are inhabited only by penguins and seals.

36.     In addition to the global 10% tariff, the Liberation Day Order levied much higher tariff rates on dozens of countries based on what the administration claimed to be an estimate of "tariff and nontariff barriers," but ultimately turned out to be a simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country.

37.     The chosen formula is not an accepted methodology for calculating trade barriers and has no basis in economic theory.

38.     On April 9, 2025, the President issued an additional Executive Order, entitled "Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation And Alignment,"[8] which paused the elevated tariff rates on most countries for 90 days, while leaving the global 10% tariff in place for all countries.

39.     The April 9 Order did not reduce the tariff rate applied to imports from China. Instead, it imposed a new, higher tariff rate of 125% on Chinese goods in retaliation for China's imposition of its own tariffs in response to the President's imposition of elevated tariffs on China. The tariff rate imposed on China was later increased to 145%.

40.     On April 11, 2025, the President issued a Memorandum entitled "Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended,"[9] providing clarification of allowable exceptions under the Liberation Day Order. The Memorandum states that "semiconductors," defined as including products classified in various headings and subheadings of Chapters 84 and 85 of the Harmonized Tariff Schedule of the United States (HTSUS), are exempted from the tariffs imposed by the

---

[8] Available at https://www.whitehouse.gov/presidential-actions/2025/04/modifying- reciprocal- tariff-rates-to-reflect-trading-partner-retaliation-and-alignment/.

[9] Available at https://www.whitehouse.gov/presidential-actions/2025/04/clarification-of- exceptions-under-executive-order-14257-of-april-2-2025-as-amended/.

Liberation Day Order.

41.     On May 12, 2025, the President issued Executive Order, entitled "Modifying Reciprocal Tariff Rates to Reflect Discussion with the People's Republic of China,"[10] lowering the IEEPA Reciprocal tariff of Chinese goods from 125% to 10%. However, the 20% tariff imposed by Executive Order 14228, entitled "Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China," continued to exist.

42.     On July 30, 2025, the President issued Executive Order 14323, entitled "Addressing Threats to the United States by the Government of Brazil,"[11] which imposed an additional 40% tariff on imports from Brazil. This Executive Order cited the political prosecution of former President Jair Bolsonaro, which constituted "an unusual and extraordinary threat," as the reason for this additional tariff. *Id.*

43.     On July 31, 2025, the President issued Executive Order 14257, entitled "Further Modifying the Reciprocal Tariff Rates,"[12] which reinstated the country-specific IEEPA Reciprocal tariff. Imports from countries covered by Executive Order 14257 were imposed with a tariff rate of at least 10%.

44.     Also on July 31, 2025, the President issued Executive Order, entitled "Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border,"[13] which imposed an additional 25% tariff on imports from Canada, effectively raising the tariff on Canada to 35%.

45.     On August 6, 2025, the President issued Executive Order 14329, entitled "Addressing Threats to the United States by the Government of the Russian Federation."[14] This Executive Order

---

[10] Available at https://www.whitehouse.gov/presidential-actions/2025/05/modifying-reciprocal- tariff-rates-to-reflect-discussions-with-the-peoples-republic-of-china/.

[11] Available at https://www.whitehouse.gov/presidential-actions/2025/07/addressing-threats-to- the-us/.

[12] Available at https://www.whitehouse.gov/presidential-actions/2025/07/further-modifying-the- reciprocal-tariff-rates/#top.

[13] Available at https://www.whitehouse.gov/presidential-actions/2025/07/amendment-to-duties- to-address-the-flow-of-illicit-drugs-across-our-northern-border-9350/.

[14] Available at https://www.whitehouse.gov/presidential-actions/2025/08/addressing-threats-to- the-united-states-by-the-

imposed an additional 25% tariff on imports from India for "directly or indirectly importing Russian Federation oil." *Id.*

46.     On August 11, 2025, the President issued Executive Order 14358, entitled "Further Modifying Reciprocal Tariff Rates to Reflect Ongoing Discussions with the People's Republic of China,"[15] extending the suspension of China's country-specific IEEPA tariff rate until November 10, 2025.

47.     On November 4, 2025, the President issued Executive Order 14357, entitled "Modifying Duties addressing the Synthetic Opioid Supply Chain in the People's Republic of China,"[16]reducing the 20% additional tariff (imposed by Executive Order 14228, "Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China") to 10%.

48.     Additionally, on November 4, 2025, the President issued Executive Order 14358, entitled "Modifying Reciprocal Tariff Rates Consistent With the Economic and Trade Arrangement Between the United States and the People's Republic of China," further extending the suspension of China's country-specific IEEPA tariff rate until November 10, 2026.

49.     On November 14, 2025, the President issued Executive Order entitled "Modifying the Scope of the Reciprocal Tariff with Respect to Certain Agricultural Products" amending the scope of products covered by IEEPA Reciprocal tariffs imposed by the Liberation Day Order.

50.     As a statutory basis, the Liberation Day Order, Executive Order 14323,  Executive Order 14257, and Executive Order 14329 all cite the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 et seq. ("IEEPA"), the National Emergencies Act, 50 U.S.C. § 1601 et seq., section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and section 301 of title 3, United States Code.

---

government-of-the-russian-federation/.

[15] Available at https://www.whitehouse.gov/presidential-actions/2025/08/further-modifying- reciprocal-tariff-rates-to-reflect-ongoing-discussions-with-the-peoples-republic-of-china/.

[16] Available at https://www.whitehouse.gov/presidential-actions/2025/11/modifying-duties-addressing-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china/.

51.    None of these statutes grants the President the authority to impose tariffs, and the extent that the provide for any relief, there must be an actual "emergency". Such statutes do not permit the taking of relief on an unsupported pretext.

52.    The Constitution explicitly reserves to Congress the power to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8 cl.1, 3.

53.    Title 19 of the United States Code, "Customs and Duties," (as opposed to Title 50, "War and National Defense") is where one would expect to find such presidential authority, but it makes no mention of such authority.

54.    Congress knew how to grant the President tariff authority if it wanted to.

55.    Under 19 U.S. Code § 1862, the President has a clear framework for adjusting duties and import restrictions for the purpose of "safeguarding national security." Yet the President has attempted to avoid that framework by stretching Congress's specific grant of emergency authority into general tariff authority. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin*., 595 U.S. 109, 125 (2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) (Congress "does not . . . 'hide elephants in mouseholes'").

56.    Other specific grants of authority for the President to impose tariffs in limited specific circumstances exist. Under 19 U.S.C. § 2411, the President may impose tariffs on other countries that have violated trade agreements. And the President may provide specific, targeted relief to industries that need time to adjust to foreign competition pursuant to 19 U.S.C. § 2251.

57.    IEEPA provides that the President may:

(A)    investigate, regulate, or prohibit—

(i)    any transactions in foreign exchange;
(ii)    transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof, the importing or exporting of currency or securities, by any person, or with respect to any property, subject to

the jurisdiction of the United States;

(B)    investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .50  U.S.C. § 1702.

58.    IEEPA further provides that these authorities "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

59.    The word "tariff" does not appear in the IEEPA, nor does any synonym or equivalent.

60.    No previous President has used IEEPA to impose tariffs, except for President Trump himself briefly during his first term, in an executive action that was withdrawn before it was fully implemented or subject to judicial review. Tom Campbell, Presidential Authority to Impose Tariffs, 83 La. L. Rev. 596, 597 (2023).

61.    The "unusual and extraordinary threat" asserted as a "national emergency" by the so-called "Liberation Day" Order is not an emergency, and is not unusual, extraordinary, new, unexpected, odd, or even surprising.

According to that order, the President find[s] that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States. That threat has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system. I hereby declare a national emergency with respect to this threat.[17]

62.    In other words, the national emergency claimed to be unusual and extraordinary in this case is the existence of bilateral trade deficits in goods (excluding services, for which the United States runs a trade surplus with the world) with some foreign trading partners.

---

[17] Available at https://www.whitehouse.gov/presidential-actions/2025/04/regulating- imports- with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large- and-persistent-annual- united-states-goods-trade-deficits/.

63.    Trade deficits are not unusual or extraordinary—the United States has run a net trade deficit at most times since World War II, and consistently since the 1970s. Brian Reinbold, Yi Wen, *Historical U.S. Trade Deficits*, Federal Reserve Bank of St. Louis, May 17, 2019.[18] That necessarily includes bilateral trade deficits with many individual nations.

64.    Nor are trade deficits an emergency or even necessarily a problem; they simply mean that some other country sells lots of things Americans want to buy, or that its people are unwilling or unable (often because of poverty) to purchase many American goods.[19] Moreover, trade deficits go hand in hand with capital surpluses, which increases investment in the United States. Norbert Michel, *Trade and Investment Are Not a Balancing Ac*t, Cato Institute, Nov. 9, 2023.[20]

65.    Section 604 of the Trade Act of 1974 provides that "[t]he President shall from time to time, as appropriate, embody in the Harmonized Tariff Schedule of the United States the substance of the relevant provisions of this chapter, and of other Acts affecting import treatment, and actions thereunder, including removal, modification, continuance, or imposition of any rate of duty or other import restriction." 19 U.S.C. § 2483.

66.    Section 604 is a bookkeeping provision: it assigns to the President the task of periodically updating the Harmonized Tariff Schedule to reflect changes in policy that have occurred. It does not set out any power, authority, or process by which the President may unilaterally set such policies.

67.    The National Emergencies Act, 50 U.S.C. § 1601 et seq., provides the general framework for declarations of national emergencies. It explicitly disclaims granting any substantive authority itself,

---

[18] Available at https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s- trade-deficits.

[19] Economists generally agree bilateral trade deficits are not a meaningful problem at all, much less an emergency or an extraordinary and unusual threat. For overviews, see James McBride and Andrew Chatzky, *The U.S. Trade Deficit: How Much Does It Matter?*, Council on Foreign Relations (2019), available at https://www.cfr.org/backgrounder/us-trade-deficit-how-much- does-it-matter (noting that most economists recognize bilateral trade deficits do not matter, and the overall trade deficit is determined mainly by macroeconomic forces); Michael Chapman, *Ignore the Politicians: Trade Deficits Don't Really Matter*, Cato Institute (Aug. 29, 2024), available at https://www.cato.org/blog/ignore-politicians-trade- deficits-dont-really-matter (summarizing standard economic analysis showing that trade deficits don't matter).

[20] Available at https://www.cato.org/policy-analysis/trade-investment-are-not-balancing-act.

instead requiring that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631.

68.    3 U.S.C. § 301 gives the President "[g]eneral authorization to delegate functions" to subordinate federal officials. It has nothing to do with tariffs or trade regulation.

69.    The United States Supreme Court ruled the President exceeded his authority when he illegally imposed IEEPA tariffs.

70.    Plaintiff HPT imported certain items subject to the illegal tariffs and was forced to pay the illegal tariffs/duties plus brokerage charges.

## VII.    CLASS ALLEGATIONS

71.    Plaintiff brings this action on behalf of itself and, under Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2) and (b)(3), as representative of a class defined as follows:

**Nationwide Class**

All individuals or entities who have paid or will pay IEEPA tariffs to UPS after April 2, 2025 due to the illegal IEEPA tariffs imposed because they did or will import products into the United States and were forced to pay the illegal tariffs up to when the effects of the tariffs cease.

72.    Excluded from the Class are Defendants, any parent, subsidiary, or affiliate of any Defendant; any entity in which any Defendant has or had a controlling interest, or which any Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assign of any Defendant, as well as units of the federal and state government.

73.    This action should be certified as a class action for the following reasons:

a.    Members of the Class are so numerous that joinder is impracticable.  The Class consists of at least hundreds of thousands of persons or entities.[21]  Further, the Class is readily identifiable from

---

[21] In November, a 10 percent tariff was associated with a 1.4 percent decline in foreign export prices, suggesting an 86

information and records in the Defendants' possession.

b.      Plaintiff's claims are typical of those of the Class. All Members of the Class were damaged by the same unlawful conduct — *i.e.*, they were overcharged for goods as a result of Defendants' unlawful conduct and paid illegal tariffs for imported goods.

c.      Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

d.      Plaintiff is represented by counsel with experience in the prosecution of class action litigation, and with particular expertise in complex and class litigation.

e.      Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Members of the Class because Defendants have acted on grounds generally applicable to the entire Class thereby making overcharge damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' unlawful conduct.

74.     Common questions of law or fact:

a.      Whether this Court should immediately order a refund to Plaintiff and the Class of the tariffs and duties and additional fees and interest collected from Plaintiff and the Class on all entries subject to IEEPA duties, with interest as provided by law;

b.      Whether this Court should award Plaintiff and the Class their reasonable costs, including attorneys' fees, incurred in bringing this action;

c.      Whether Plaintiff and the Class is entitled to the relief described in the Prayer for Relief and as this Court deems proper.

75.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy, and there are multiple questions of law common to each Class, including but not limited

---

percent pass-through to U.S. import prices. <u>Who is Paying for the 2025 U.S. Tariffs?</u>, Federal Reserve Bank of New York, Feb. 12, 2026

to:

a.    Absent a class action, Class members as a practical matter will be unable to obtain protection of their rights in the tariff refund process and the Class may be unable to recover the millions of dollars of tariff refunds.

b.    It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions.

c.    When the common issues have been adjudicated, the Court will be able to determine the claims of all members of the Class;

d.    A class action will permit an orderly and expeditious administration of the Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions; and Whether this Court should immediately order the CBP to reliquidate any IEEPA tariffs; full refund of the illegally imposed tariffs along with fees and interest;

e.    The lawsuit presents no difficulties that would unduly impede its management by the Court as a class action.

76.    Given the common questions of law, any factual variation among members of the Class is insufficient to defeat Rule 23's permissive standard.

77.    The class representative's claims are typical of its Class, because the representative has imported products from the respective country(ies) tariffed under IEEPA and paid the associated tariff duties. As a result, the typicality requirement of Fed. R. Civ. P. 23(a)(3) is met here. Defendants also treat all members of the Class the same—or substantially the same—as to the applicable allegations and claims made herein. This makes the claims typical of the Class in that respect.

78.    Plaintiff will fairly and adequately protect the interests of its class members. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class. Additionally, Plaintiff seeks identical relief that would benefit all putative members of the Class.

79.     Plaintiff has also retained counsel competent and experienced in the prosecution of class action litigation to represent themselves and the Class with particular experience in the relief requested here. The adequacy-of-representation requirement of Fed. R. Civ. P. 23(a)(4) is thus met here.

80.     Fed. R. Civ. P. 23(b)(2) Class. Certification for injunctive and declaratory relief is appropriate under Rule 23(b)(2) because Defendants have acted in a manner generally applicable to the Class, such that preliminary and final injunctive relief, and corresponding declaratory relief, are appropriate to the Class. Fed. R. Civ. P. 23(b)(2).

81.     Fed. R. Civ. P. 23(b)(3) Class. Certification for damages is appropriate under Rule 23(b)(3) because questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Defendants have acted in a manner generally applicable to the Class, such that an award of damages is appropriate to the Class. Fed. R. Civ. P. 23(b)(3).

## VIII.   <u>CLAIMS</u>

### COUNT I
### Declaratory Relief Under 28 U.S.C. § 2201

82.     Plaintiff incorporates the above paragraphs by reference.

83.     Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

84.     Plaintiff's claims present an actual controversy as to the President's authority under IEEPA, the constitutionality of IEEPA, and the authority of CBP to implement and collect the resulting tariffs.

85.     Plaintiff paid the illegal IEEPA tariffs to UPS entities and therefore is a carrier imposing tariffs on goods imported to the United States and have suffered injury by having been required to pay IEEPA duties as a result of the Challenged Tariff Orders on goods it has imported into the United States.

86.     Plaintiff and the Class are entitled to a declaration that the UPS does not have valid claims

17

to retain the illegal IEEPA tariff refunds and related fees.

87.    Plaintiff and the Class are entitled for this Court to declare that CBP has no interest in the illegal tariffs collected and that CBP has not right to control the timing or delivery of those funds from the U.S. Government to the UPS entities.

88.    UPS has no legal right under any law to interfere with Plaintiff's rights to have the IEEPA tariffs paid to Plaintiff and the Class.

89.    This Court can exercise its equitable power to enter a declaratory judgment that the Challenged Tariff Orders are unlawful for any of the above reasons and the applicable trial, appellate, and Supreme Court rulings and that CBP lacks authority to implement and collect the resulting tariffs.

90.    CBP is improperly inserting itself into the refund process, prohibiting the efficient distribution of its ill-gotten gains from the collection of IEEPA tariffs since April 2, 2025.

91.    Absent court intervention, UPS will not refund the tariffs, thereby harming Plaintiff and the Class.

92.    Plaintiff seeks a declaratory judgment that:

a.  CBP lacks jurisdiction to supersede federal law to retain the illegal IEEPA tariffs;

b.  CBP lacks jurisdiction to supersede federal law to prevent UPS from refunding the illegally held tariffs;

c.  CBP lacks jurisdiction over the illegally held tariffs and cannot interfere with UPS' payment of the tariff refunds to Plaintiff and the Class.

d.  UPS must repay the tariffs with interest for funds improperly taken from Plaintiff and the Class;

e.  CBP must be enjoined from refusing to allow the distribution of the ill-gotten IEEPA tariffs.

f.  CBP must be enjoined to immediately refund the illegal IEEPA tariffs to UPS for

distribution to the Class.

g.  CBP must be enjoined to preserve the IEEPA tariffs collected and not be used, diverted or

distributed for purposes other than refunding them to the Class.

## COUNT II
### Injunction Against Defendants United States of America and Customs and Border Protection

93.  Plaintiff incorporates the above paragraphs by reference.

94.  The Supreme Court ruled the IEEPA tariffs were illegal on February 20, 2026,

affirmed the judgment of the United States Court of Appeals for the Federal Circuit and remanded

the case to this Court.  Learning Resources, Inc., 607 U.S. ____ (2026).  The Supreme Court also

affirmed the Federal Circuit's ruling that the CIT has "exclusive jurisdiction" over these tariff

related issues.  *Id.*

95.  Plaintiff and members of the Class are entitled to an injunction to prohibit the

United States of America and United States Customs and Border Protection from interfering with

the orderly refund of the illegal IEEPA tariffs.  The Plaintiff and the Class are entitled to the amount

of Defendants' ill-gotten gains resulting from their unlawful, and inequitable conduct, in imposing,

collecting, and holding billions of dollars in illegal IEEPA tariffs and related fees, and to the

establishment of a constructive trust consisting of such amount, from which Plaintiff and members

of the Class may make claims.

96.  The interference, according to *Politico* and *Fortune*, includes reports that have

emerged from inside the Trump Administration that the Administration is looking for ways for the

U.S. Treasury to keep the illegally-collected tariff revenues including *inter alia*: (a) using "pressure

tools" to discourage companies from filing refund claims; (b) creating new mechanisms to prevent

the Federal Government from refunding the IEEPA-based tariffs; and (c) offering expedited

refunds only if companies agree to forfeit some of the money to allow those companies to "jump

the queue" to receive refunds first, imposing delays for those seeking refunds behind them in line.[22]

97.     In January 2026, the President of the United States told the New York Times: "the tariff money is 'so substantial' that he could comfortably send '$2,000 payments' to unspecified 'Americans' 'toward the end of the yeear.'" Then, in a campaign email sent on February 27, 2026, he raised the spectre of checks again without authority or actual commitment.   Then he announced on March 2, 2026, again without authority, that he is considering sending the Government would be issuing checks from the Treasury to citizens, purportedly from the pool of illegal tariffs without regard to whether any of these proposed recipients actually paid any tariffs. The United States of America and CBP must be enjoined from interfering with and the wasting of the illegally collected tariff fund and be prohibited from interfering with refunding those ill-gotten proceeds to the Plaintiff and the Class, those who actually paid the tariffs.

## COUNT III
## Constructive Trust

98.     Plaintiff incorporates the above paragraphs by reference.

99.     Plaintiff and members of the Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, and inequitable conduct, in imposing, collecting, and holding billions of dollars in illegal IEEPA tariffs and related fees, and to the establishment of a constructive trust consisting of such amount, from which Plaintiff and members of the Class may make claims on a pro rata basis.

100.     It would be wrong and inequitable for Defendants to be permitted to retain any of the illegal tariffs and related fees that Plaintiff and members of the Class paid for illegal IEEPA tariffs.

101.     Defendants are aware of and appreciate the benefits that Plaintiff and members of

---

[22] Feb. 27, 2026 *Fortune*,  https://fortune.com/2026/02/27/trump-tariff-refunds-ieepa-revenue-lawsuits-supreme-court-international-trade/ citing Feb. 26, 2026 *Politico*, https://www.politico.com/news/2026/02/26/trumps-next-tariff-fight-keeping-the-money-00799774

the Class have bestowed upon them.

102.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Class members.

103.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiffs and Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant the following relief:

a.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. Rule 23 (a), 23(b)(1), b(2) and (b)3, direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as named representative of the Class;

b.    Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and benefits;

c.    Award Plaintiff and the Class damages in the amount of any tariffs collected by Defendants pursuant to the challenged orders and order refunds and associated fees thereof plus interest;

d.    Enter judgment against Defendants and in favor of Plaintiff and the Class;

e.    Enjoin the United States of America and the United States Customs and Border Protection from wasting the tariffs/duties and from interfering with the refund process.

f.    Impose a constructive trust on the tariffs refunded to the UPS entities to the benefit of the Plaintiff and the Class.

g.    Award Plaintiff and the Class other such damages as are appropriate;

h.    Award Plaintiff and the Class cost of suit, attorneys' fees and expenses, and interest as appropriate; and

i.    Grant any such other relief as this Court may deem just or proper in this action.

A TRIAL BY JURY IS DEMANDED ON ALL COUNTS SO TRIABLE.

Respectfully submitted,

Date: March 5, 2026            /s/ *Marvin A. Miller*
                              Marvin A. Miller
                              Lori A. Fanning
                              Kathleen E. Boychuck
                              **MILLER LAW LLC**

53 West Jackson, Suite 1320
Chicago, Illinois  60604
312-332-3400 (telephone)
MMiller@millerlawllc.com
LFanning@millerlawllc.com
KBoychuck@millerlawllc.com

Dennis E. Murray, Jr.
**MURRAY & MURRAY CO, L.P.A.**
111 East Shoreline Drive
Sandusky, OH 44870
419-624-3126 (D)
419-624-0707 (F)
dmj@murrayandmurray.com

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rules 4(b) and 4(h) of the Rules of the Court of International Trade, I certify that on or before March 5, 2026, copies of the foregoing Summons and Complaint were served upon the following individuals, by certified mail, return receipt requested:

**<u>UPON UNITED PARCEL SERVICE, INC.</u>**
UPS, Inc.
55 Glenlake Parkway NE,
Sandy Springs, GA 30328

**<u>UPON UPS SUPPLY CHAIN SOLUTION,</u>**
UPS Supply Chain Solution
12380 Morris Road,
Alpharetta, GA 30005

**<u>UPON U.S. CUSTOMS AND BORDER PROTECTION</u>**
U.S. Customs and Border Protection
1300 Pennsylvania Avenue, NW
Washington D.C. 20229-0002

**<u>UPON THE UNITED STATES</u>**
Justin Miller Attorney-In-Charge International Trade Field Office Commercial Litigation Branch
**U.S. Department of Justice**
Room 346
26 Federal Plaza
New York, New York 10278

Date: <u>March 5, 2026</u>

<u>/s/ Marvin A. Miller</u>
Marvin A. Miller
Lori A. Fanning
Kathleen E. Boychuck
**MILLER LAW LLC**
53 West Jackson, Suite 1320
Chicago, Illinois 60604
312-332-3400 (telephone)
LFanning@millerlawllc.com
KBoychuck@millerlawllc.com
Mmiller@millerlawllc.com